IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REGINA M. MAYO,

        Plaintiff,

v.

MICHAEL J. ASTRUE
Commissioner of Social Security,

        Defendant.

Civil Action No. 10-792-RGA

**MEMORANDUM OPINION**

David J. Lyons, Esq., Wilmington, Delaware; Attorney for Plaintiff Regina M. Mayo.

Charles M. Oberly, III, Esq., Eric P. Kressman, Esq., Donald K. Neely, Esq., Patricia A. Stewart, Esq., Philadelphia, Pennsylvania; Attorneys for Defendant Michael J. Astrue, Commissioner of Social Security.

August 3, 2012

Wilmington, Delaware

ANDREWS, United States District Judge:

## I. INTRODUCTION

Plaintiff Regina M. Mayo appeals the decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying Mayo's application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Both Mayo and the Commissioner have filed Cross-Motions for Summary Judgment. Mayo's Motion for Summary Judgment asks the Court to award her DIB. The Commissioner's Cross-Motion for Summary Judgment requests the Court to affirm the Commissioner's decision and to enter judgment in the Commissioner's favor. Mayo's Motion for Summary Judgment will be granted, and the Commissioner's Cross-Motion for Summary Judgment will be denied. This matter will be remanded for further proceedings.

## II. BACKGROUND

### A. Procedural History

Mayo filed an application for DIB in May 2008. Tr. 64. Mayo claimed a disability onset date of December 28, 2006. The Commissioner denied Mayo's claim initially and again upon reconsideration. Tr. 66-70, 75-80. After a hearing, an administrative law judge ("ALJ") issued a decision on November 27, 2009, finding that Mayo was not disabled and denying Mayo benefits. Tr. 10-20. Mayo requested review from the Appeals Council, and the Appeals Council denied Mayo's request, making the ALJ's decision the final decision of the Commissioner. Tr. 1. Mayo filed this lawsuit on September 16, 2010.

### B. Mayo's Non-Medical History

Mayo was born on November 22, 1964. Tr. 33. She has an Associate's Degree, and she previously worked in the banking industry as a secretary, assistant vice president, and vault

2

attendant supervisor. Tr. 33. The relevant period at issue is from the alleged disability onset date, December 28, 2006, to Mayo's last insured date, June 30, 2011. Tr. 12.

### C. Mayo's Medical History

Mayo's medical complications stem from a car accident that occurred in July 2004. Tr. 268, 432-33. She sustained trauma to her neck and back, and she sought immediate medical treatment. Tr. 432-33. Doctors diagnosed a neck and back strain and prescribed medicine for pain. Tr. 433.

Mayo followed up with John Moore, M.D., her primary health care provider, at Family Practice Associates. Tr. 45-46, 307. For her pain and associated muscle spasms, Mayo has been prescribed a litany of medications, and since the accident up to the date of the ALJ hearing, she continued taking a long list of prescription medications. Tr. 36, 291-95, 598-624.

Following the accident in September 2004, William H. Hartz, M.D., ordered an MRI of Mayo's cervical spine, which showed multilevel degenerative disc disease. Tr. 444-45. Dr. Hartz noted reversal of the spine curvature and multiple levels of thecal sac pressure and spinal cord flattening, but he noted no specific disc protrusion or acute abnormalities. Tr. 444-45.

At the same time, Mayo began treatment with Peter Bandera, M.D., a physical medicine and rehabilitation specialist. Tr. 248-73. Dr. Bandera reviewed Mayo's cervical MRI and confirmed Dr. Hartz's findings. Tr. 268. Mayo told Dr. Bandera that "basic activities such as sitting [gave] her advanced pain." Tr. 268. Dr. Bandera's initial evaluation of Mayo revealed diminished cervical and lumbar lordosis with advanced spasms, limited range of motion of and tenderness in the cervical and lumbar spine, and a positive bilateral straight leg raise test ("SLR"). Tr. 268.

Mayo continued treatment with Dr. Bandera until June 2007. Tr. 248-73, 486-550. During this time, Dr. Bandera diagnosed Mayo with chronic traumatic cervical/lumbar syndrome

3

and cervical multilevel degenerative disc disease. Tr. 494-95. In Dr. Bandera's medical opinion, Mayo's diagnosis would result in "at least a moderate partial permanent impairment relative to the low back, and moderate to advanced partial permanent impairment relative to the cervical spine," and that Mayo's future for "further functional gains [was] poor." Tr. 495. Repeatedly from 2004 to 2007, Dr. Bandera ordered Mayo to maintain her "out of work" status. Tr. 251-68.

In September 2005, John Parkerson, M.D., an independent medical examiner for Progressive Northern Insurance Company, reviewed Mayo's medical records and found that Mayo was "at maximum medical improvement from physical therapy" and that no objective findings supported Mayo's continued out of work status. Tr. 472.

In January 2006, in an attempt to alleviate her cervical pain, Mayo underwent a right C3-C6 nerve ablation. Tr. 213. The surgery reduced some of Mayo's pain, but she still continued to experience residual pain, limited range of motion, and muscle spasms in her neck and back. Tr. 253.

In July 2006, Dr. Moore stated that physical and chiropractic therapy was "no help" for Mayo's pain and that Mayo was still unable to work. Tr. 302-03. Dr. Moore noted that Mayo's disability would probably extend through the near future. Tr. 303.

As early as December 2004, Dr. Bandera started discussing a work hardening program with Mayo so that she could attempt to return to sedentary/light duty work. Tr. 262. In September 2006, Drs. Bandera and Moore attempted to clear Mayo for one of these programs, despite Mayo's ongoing muscle spasms, pain, and limited range of motion. Tr. 247, 252. Jennifer Hilliard, MPT, was Mayo's work hardening therapist, and she gave Mayo instruction on how to alleviate pain while at the work place, specifically while Mayo was sitting. Tr. 247. The

4

therapist noted Mayo's limited range of motion at the extremes in the neck and a fifty percent extension loss in Mayo's trunk. Tr. 247.

In February 2007, Dr. Bandera reported Mayo had "failed [the] work hardening program" and continued to experience pain with associated spasms and limited range of motion. Tr. 251. Dr. Bandera discussed with Mayo the possibility of returning to modified/light duty work on a trial basis and set a target start date for the Spring/Summer of 2007. Tr. 251. Dr. Bandera last examined Mayo on June 20, 2007, and he cleared Mayo for modified sedentary duty. Tr. 250.

Mayo did attempt to return to work in 2007, but it was unsuccessful. Tr. 42-43. On her first day, Mayo started to experience pain after one hour and forty-five minutes of sitting at the job. Tr. 43. Mayo took her medication as prescribed and subsequently "became too drowsy to do anything at work" and fell asleep. Tr. 43.

In September 2007, Mayo returned to Dr. Moore for a reexamination of her back pain. Tr. 327-29. Dr. Moore noted Mayo's pain being a severe, dull aching, and that Mayo had reduced muscle strength due to pain. Tr. 327. Because Mayo "want[ed] to find a job," Dr. Moore rearranged the order in which Mayo would take her pain medicine, Percocet and Norco, in order to reduce Mayo's fatigue from the medications. Tr. 327. Mayo continued treatment with Dr. Moore in the following months. Tr. 316-26. Dr. Moore noted bilateral cervical, thoracic, and lumbar spasms and tenderness. Tr. 319, 325.

In mid-2008, Mayo returned to Family Practice Associates and continued treatment with David M. Krasner, DO, for pain she described as "sharp stabbing" pain that was "gradually worsening." Tr. 622. Dr. Krasner noted spasms, tenderness, decreased range of motion in Mayo's cervical, thoracic, and lumbar spine, and a positive SLR test. Tr. 621. Additionally, Dr. Krasner found Mayo had moderate tenderness in her right cervical area, and marked tenderness in the lumbar area with spasms and a decreased range of motion. Tr. 617. Mayo told Dr.

Krasner that a neurosurgeon, Dr. Rastogi, did not think Mayo would be a good candidate for surgery and that she needed a pain management specialist. Tr. 620.

During one of these visits, on August 15, 2008, Mayo asked Dr. Krasner to complete a disability form. Tr. 46, 400-06, 620. Dr. Krasner indicated that Mayo could only lift or carry less than ten pounds, could only stand or walk for less than two hours in an eight hour workday, could only sit less than six hours in an eight hour workday, and was limited in pushing or pulling with her upper and lower extremities. Tr. 400-06. Dr. Krasner stated that Mayo could never climb, balance, stoop, kneel, crouch, or crawl. Tr. 402. He noted that Mayo's impairments were attributed to her multiple bulging discs, pain, spasms, and decreased range of motion, and that the severity of her impairments was consistent with the objective medical evidence. Tr. 405.

In August 2008, Pawan Rastogi, M.D., examined Mayo and determined that Mayo had chronic neck pain with some radiculopathy and a narrow spine with multi-level spondylosis. Tr. 553-54. In her examination, Dr. Rastogi noted that Mayo had pain and a diminished range of motion in her neck. Tr. 553. Dr. Rastogi did not recommend surgery for Mayo, but she determined that Mayo needed conservative, chronic pain management. Tr. 554.

In September 2008, Mayo saw Philip Kim, M.D., a pain medicine specialist. Tr. 555-56. Dr. Kim noted Mayo walked with difficulty, had tenderness in paravertebral musculature, and had good range of motion in her neck. *Id.* Dr. Kim reviewed the results of a November 2008 MRI and saw multilevel disc disease with disc osteophyte, facet arthropathy, and central canal stenosis. *Id.*

Before the ALJ hearing in 2009, Katy Goodman, MD, at Family Practice Associates, noted that Mayo had tenderness and swelling along the lower cervical spine and that Mayo rated her pain as an eight on a ten point scale (with a ten being the worst). Tr. 603-07.

6

Three state agency examiners reviewed Mayo's record in this case. In July 2008, V.K. Kataria, M.D., completed a residual functional capacity ("RFC") assessment based on Mayo's record and determined that Mayo could lift twenty pounds, could stand or walk for two hours in an eight hour work day, could sit six hours in an eight hour workday, and was not limited in pushing or pulling with her upper and lower extremities. Tr. 395. Dr. Kataria noted a negative SLR. Tr. 396. Dr. Kataria found Mayo could occasionally climb, stoop, kneel, crouch, or crawl, but could not balance. Tr. 397. Dr. Kataria's findings were affirmed by state agency physicians Martin Rubinowitz, M.D., and Kasiel Steinhardt, M.D. Tr. 423, 429-30.

### D.     ALJ Hearing

#### 1.     <u>Mayo's Testimony</u>

At her hearing, Mayo testified at length about her medical complications and associated pain.[1] Mayo's testimony can be summarized as follows:

- Mayo sustained injuries to her neck and back following a car accident, and she continues treatment for those injuries.

- Mayo's injuries are associated with substantial pain, for which she takes a litany of medication.

- Mayo's medications cause drowsiness and prevent her from maintaining a consistent sleep pattern.

- Mayo's two children help her with grooming, transportation, and daily household activities.

- On certain days, Mayo is unable to leave her bed due to her pain.

---

[1] Mayo also testified that she suffers from gastrointestinal problems, obesity, and cardiology problems, and she also suffers from depression and anxiety. Tr. 29-54. Mayo describes these physical impairments, however, "as supporting impairments." (D.I. 8, at 11). In regards to Mayo's mental problems, for the purposes of this opinion, only Mayo's back and neck pain will be addressed. "[Mayo's] primary impairments [are] . . . her neck and back conditions and their associated pain . . . ." (D.I. 8, at 10-11).

7

- Mayo is unable to sit for more than two hours without experiencing severe pain, numbness, and tingling in the back, arms, and legs.

- Mayo has a substantial work history.

- Mayo attempted to return to work in 2007 but was unsuccessful due to pain and side effects of her medications.

- Mayo had Dr. Krasner complete an RFC assessment around "September 2008."

Tr. 29-54.

### 2. Vocational Expert's Testimony

The ALJ presented the vocational expert ("VE") with four hypothetical questions. Tr. 54-61. First, the ALJ asked,

> Q: If we have a hypothetical individual who's a younger individual with a high school plus education and past relevant work history similar to [Mayo's], and if this person has all the symptoms and limits stated by [Mayo] during the hearing, would this person be capable of doing any jobs?
> A: In my opinion, . . . I would indicate no, and that's just based on her explanation of her ability to even do daily activities, also regarding her pain.

Tr. 55. The VE stated that pain symptoms could affect vocational abilities if an individual was unable to maintain eighty percent productivity.

The ALJ then asked the VE a similar hypothetical but added, "[A]ssume that this person, despite what he or she might say, would be capable of doing work activity at a sedentary level of exertion as defined . . . would this person be capable of doing any jobs?" The VE indicated that the hypothetical person in the ALJ's question would be able to perform "sedentary unskilled office helper [or] mail clerk, nonpostal." Tr. 57.

Next, the ALJ asked the VE about the RFC assessment completed by Dr. Krasner around September 2008. "[I]f we have a hypothetical individual with . . . the [] limitations specified by [the RFC assessment completed by Dr. Krasner], with those limits, any jobs?" The VE indicated that based on the limitations outlined in the RFC, a significant number of jobs did not exist for

8

such an individual. Tr. 58. When the ALJ present Dr. Kataria's RFC assessment to the VE, however, the VE indicated the limits set forth in Dr. Kataria's RFC would allow an individual to perform sedentary work. Tr. 58-59.

### E. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen,* 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, the

9

claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(I). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. If the claimant is not suffering from a severe impairment or a severe combination of impairments, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

At step three, if the claimant's impairments are severe, the Commissioner compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer,* 186 F.3d at 428. If a claimant's impairment or its medical equivalent matches an impairment in the listing, then the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments or impairment combination are not listed or medically equal to any listing, then the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by her or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001) (citations omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled. *See id.*

If the claimant is unable to return to past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating "not disabled" finding if claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on

the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### F.     The ALJ's Decision

Following the above-outlined process, the ALJ ultimately concluded that Mayo could perform other work in the national economy and, therefore, was not disabled. During the course of the analysis, the ALJ made the following findings: (1) Mayo had not engaged in substantial gainful activity since December 28, 2006, the alleged onset date. (2) Mayo had various severe impairments, including degenerative disc disease of the spine, gastrointestinal problems, obesity, depression and anxiety. (3) Mayo did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (4) Mayo had the residual functional capacity to perform sedentary work as defined. (5) Considering Mayo's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that Mayo could perform. (6) Therefore, Mayo was not disabled from December 28, 2006 through the date of the ALJ's decision. Tr. 12-20.

### III.    STANDARD OF REVIEW

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart,* 399 F.3d 546,

552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, C.A. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citations omitted).

The Third Circuit has explained that:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Even if the reviewing court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV. DISCUSSION

The ALJ determined that while Mayo was not capable of returning to her old job, she was capable of adjusting to less physically and mentally demanding work and therefore was not disabled. On summary judgment, Mayo argues this determination was incorrect because: 1) the ALJ improperly concluded that Mayo had an RFC for sedentary work, and 2) the ALJ

improperly discounted Mayo's credibility and did not properly evaluate Mayo's testimony regarding her pain.[2] (D.I. 8 at 2).

### A. The ALJ Improperly Concluded That Mayo Had An RFC For Sedentary Work

Mayo argues that the ALJ erred in concluding she had an RFC for sedentary work because the ALJ failed to credit her treating physician's opinion, instead crediting a non-treating state agency physician's opinion. (D.I. 8, at 9). Dr. Krasner, Mayo's treating physician, performed an RFC assessment for Mayo around "September 2008." Tr. 400-06. Though the RFC assessment was unsigned and undated, Mayo testified at the ALJ hearing that Dr. Krasner completed the form in September 2008. Tr. 44.[3] The ALJ gave this "mystery" RFC assessment "very little probative weight" because the findings were "in contradiction to the objective evidence of record . . . ." Tr. 17.[4]

While both parties' briefs do little to clear up exactly when Dr. Krasner completed this RFC assessment, a substantial overlap exists between the RFC assessment and Dr. Krasner's medical evidence of record. Tr. 400-06, 616-24. On August 15, 2008, Dr. Krasner saw Mayo for her back pain and "to have a disability form completed." Tr. 620. The RFC form has a "fax header" with the date of September 4, 2008. Tr. 405. The number to which the fax was sent was that of Mayo's attorney. The medical findings in Dr. Krasner's RFC assessment, e.g., Mayo's decreased range of motion, Mayo's significant pain with spasms, and Mayo's non-surgical

---

[2] Mayo also argues that the ALJ improperly ignored relevant testimony from the VE. (D.I. 8 at 2). Since this Court is remanding on other grounds and further VE testimony may be needed, this argument will not be addressed at this time.

[3] In his opinion, the ALJ incorrectly stated that Dr. Goodman completed this RFC assessment in December 2008. Tr. 17.

[4] Despite the Commissioner's brief that suggests otherwise, the ALJ did not discount Dr. Krasner's RFC assessment simply because it was unsigned and undated. (D.I. 10, p. 13). Had the ALJ been inclined to discount Dr. Krasner's RFC assessment for this reason, the appropriate procedure would have been to grant Mayo leave to submit a signed and dated RFC assessment from Dr. Krasner.

13

candidate classification, are completely consistent with the record of the August 2008 visit. Tr. 401, 620. Therefore, this Court sees little mystery with Dr. Krasner's RFC assessment and will analyze the ALJ's consideration of this treating physician's assessment accordingly.

The Third Circuit follows the "treating physician doctrine." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). This means that the ALJ must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all. *See Mason*, 994 F.2d at 1067. When a physician has treated a patient over an extended period of time, that physician's opinion should typically be afforded great weight. *See Dass v. Barnhart*, 386 F. Supp. 2d 568, 576 (D. Del. 2005). A treating physician's opinion is then afforded "'controlling weight'" if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence [in the claimant's] case record.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)). A final disability determination must not conflict with an opinion deserving of controlling weight.

An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence . . . ." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). That opinion may not be rejected without reason or for the wrong reason. *See id.* at 317. When there is contradictory medical evidence, the ALJ must carefully evaluate how much weight to give the treating physician's opinion and provide an explanation as to why the opinion is not given controlling weight. *See Gonzalez*, 537 F. Supp. 2d at 660.

Thus, even when the treating source opinion is not given controlling weight, it does not follow that it deserves no weight; the ALJ must apply several factors in deciding how much weight to assign it. *See id.* These include the treatment relationship, the length of the treatment

14

relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion offered by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *See id.* If an ALJ fails to conduct this analysis, a reviewing court cannot judge whether the ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand. *Id.*

Here, the ALJ cursorily addressed this treating physician's opinion and provided no helpful analysis as to why this treating source opinion was afforded "very little probative weight." The ALJ stated that because the findings in the RFC assessment contradicted other evidence of record, it was given very little probative weight.[5] No careful evaluation or determinative factors were applied as required by law, and no specific contradictory evidence was mentioned.[6] The fact that the ALJ's final decision mixed up not only the treating physician's name, but also the date the RFC assessment was completed–both of which Mayo testified to at the hearing–further undercuts the ALJ's conclusory rejection of this treating source opinion. Therefore, the ALJ's determination is insufficient and cannot stand.

In summary, this Court will remand so the ALJ can properly consider Dr. Krasner's RFC assessment, consistent with the law discussed in this opinion.

---

[5]Specifically, the ALJ dismissed the treating opinion in four sentences.

> In December 2008, the claimant was assessed with less than sedentary work. ([Tr. 400-06]). The assessment was unsigned. At the hearing, it was indicated that Dr. Goodman had completed this assessment. However, the severity of these findings is in contradiction to the objective evidence of record; and, therefore, pursuant to SSR 96-8p are afforded very little probative weight.

Tr. 17.

[6]The ALJ cannot reject a treating physician's opinion solely by stating that the opinion is "contradicted" by the "objective evidence of record" without specifying what the "objective evidence of record" is. The ALJ must further specify why the objective evidence is contradicting (unless it is obvious simply from stating it).

15

### B. The ALJ Did Not Improperly Discount Mayo's Testimony About Her Subjective Complaints of Pain

Mayo also argues that the ALJ improperly discredited her testimony as to the intensity, persistence, and limiting effect of her pain symptoms. The ALJ must follow a two-step process when considering subjective symptoms: (1) the ALJ must determine whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the symptoms or pain, and (2) the ALJ must determine the intensity, persistence, and limiting effects of the symptoms or pain to determine the extent they limit the ability to perform basic work. 20 C.F.R. § 404.1529. The Third Circuit standard for weighing subjective complaints of pain requires:

> (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain may support a claim for disability benefits, and may be disabling; (3) that when such complaints are supported by medical evidence, they should be given great weight; and finally (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted).

When the objective medical evidence of record does not support subjective complaints of pain, the ALJ must make a credibility determination of the claimant based upon a review of the entire record. *See Anderson v. Astrue*, 825 F. Supp. 2d 487, 499 (D. Del. 2011) (citing SSR 96-7p, 20 C.F.R. § 404.1529). The ALJ is required by regulation to consider the following factors in addition to reviewing the objective medical evidence:

> (1) daily activities; (2) location, duration, frequency and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) effectiveness of medications used in treating pain; (5) treatments other than medications that alleviate pain; (6) any other non-treatment measures that help alleviate pain (such as lying down); and (7) any other factors that relate to the pain at issue.

16

*Id.* (citing SSR 96-7p). "While there is no absolute requirement that an ALJ discuss all seven factors [above], an ALJ should analyze as many of these factors as is applicable in order to provide sufficient findings for judicial review." *Id.* at 500 n. 12 (quotations omitted).

Consistency of a claimant's statements, both internally and with other information in the record, is a strong indicator of credibility, one which the ALJ "must consider." *See* SSR 96-7p. Ultimately, the ALJ must provide a sufficient explanation for the credibility finding–complete with specific reasons supported by the case record–that makes it clear to the claimant and any reviewing body the weight the ALJ gave to the claimant's testimony and why such weight was given. *See Anderson*, 825 F. Supp. 2d at 499.

Here, the ALJ believed that Mayo's medically determinable impairments could cause the alleged symptoms but did not believe that Mayo's statements concerning intensity, persistence, and limiting effects of these symptoms were credible. Tr. 15-16. The ALJ compared Mayo's subjective complaints of pain with the objective medical evidence and found that "[Mayo] had lots of complaints, but [there] were largely unremarkable findings, including a negative stress test, echocardiogram, MRI, x-ray and lab studies." Tr. 16. The ALJ stated, "[Mayo's] statements . . . concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 15-16. In support of the conclusion that the objective medical evidence did not support the reports of pain, the ALJ specifically cited a colonoscopy, an ultrasound, a computerized tomography, multiple SLRs, physical therapy notes, a treatment plan, and dorsiflexion results. Tr. 16. This was substantial evidence to support the ALJ's conclusion.

The ALJ's explanation of his credibility findings is sufficient. While the record reflects that Mayo consistently complained of and was treated for pain in the back and neck since the 2004 accident, the ALJ is given considerable deference for credibility determinations. The ALJ

17

recited facts that fit into the SSR 96-7p rubric. Tr. 15. The Commissioner concedes, "The ALJ's assessment of [Mayo's] allegedly disabling pain was not lengthy." (D.I. 10, p. 18). It would have been preferable for the ALJ to explicitly go through the SSR 96-7p analysis, but given the deference due the ALJ's credibility determination, the Court cannot say there is not substantial evidence to support the ALJ's pain determination.

## V.     CONCLUSION

For the reasons discussed above, Mayo's Motion for Summary Judgment is granted; the Commissioner's Motion for Summary Judgment is denied. The case is remanded for a disability determination consistent with this opinion.